GBMC, Mr. Tolley. Good morning, Your Honor. May it please the Court? Kathy Netro, as the personal representative of the estate of a Medicare beneficiary, Barbara Bromwell, has standing to proceed under 42 U.S.C. 1395Y, B3A, the private cause of action for Medicare Secondary Pay Act. She has standing because that was what Congress intended when it enacted the private cause of action, and she has standing because she has suffered and did plead an injury in fact that is particularized and concrete. The complaint that was filed in the district court, and the district court did not address standing as a threshold matter, but the complaint says that there has been litigation. This is not a case where Ms. Bromwell or her estate is a stranger to GBMC, that GBMC is surprised that Ms. Bromwell has a claim against them, that they're surprised that Medicare had a claim and that they were a primary plan. All of that was alleged and all of that is known and was known to GBMC. Spokio does not require dismissal of this case in the pleadings. But Spokio does require an injury in fact, does it not? Yes, it does. And Spokio holds that violation of a statute by itself does not automatically mean you have standing. So where is the actual injury to your client? So the injury to my client is that there was a judgment that my client held that was not being paid. It was not being paid for more than four months. Well, but is there really, there wasn't really a final judgment until the revised judgment under Maryland laws, I understand it. The final judgment was the one that was issued on October 31st. So there are final judgments for purposes of appeal and there are final judgments for purposes of setting the requirement that is relevant under the private cause of action. GBMC's liability was established by a judgment dated July 22nd. The amount of the judgment... But the money you want is not your money, it's Medicare. Well, so it's... I mean, you're obligated to turn that over to Medicare, so I mean, what's... Well, what's the injury in fact? What's the injury because you're not, you're out of pocket at all? Yes. Oh, yes. So the Medicare scheme does not require when Medicare is reimbursed by subrogation of the beneficiary, does not require a 100% pass-through from the beneficiary to Medicare. The Medicare regulations and in particular 211.37 sets out a formula and the formula was cited in our initial response to the motion to dismiss. And I think also in our brief to this court, the formula says that the beneficiary doesn't have to turn it all over, can retain part of the money recovered from the defendant from the primary plan to cover procurement costs as Medicare's share of procurement costs. The money that we seek in this case is for the benefit of both the estate and Medicare. The fact that Medicare has a benefit is Congress's intent. The fact that the beneficiary is pursuing it is because Congress knew the beneficiaries would be in the best position to pursue these judgments. And when we have a judgment, which is a condition proceeding to pursuing a private cause of action, the judgment establishes... Even if you get past all this on the standing, the standard that Congress used was a failure to reimburse Medicare. And there's not a failure, there's been a reimbursement. How can there be a failure if it's been paid? So there has been a failure. Medicare still hasn't been paid. You've been paid and you have naturally been paid. You're obligated to turn that over to Medicare. So GBMC is obligated under the federal statute of regulations to pay Medicare their primary plan. The regulations provide that if Medicare is not paid, they have to pay Medicare. But if you've recovered a damage award, and that includes the Medicare advance payments, then Medicare can come after you. So Medicare can come after us, but they also can come after them. The Western Heritage case... Did they pay the money to you? They sent us a check. It's sitting in our escrow account. So nobody has received. My clients haven't received the money and I haven't received the money. But aren't you obligated to pay when you have that check? Aren't you obligated to pay that check over to Medicare? I am, but I'm also obligated to try to get Medicare all the money I can get Medicare, just as I'm obligated to get my clients all the money I can get them. But you won't get Medicare any more money? I'll get Medicare $157,000 if we win this case, and I'll get them less if we don't. Because if they get subrogation from us, they get less than the $157,000. If we get GBMC to pay Medicare directly, which is one option, one way for this case to resolve, is for them to write a check for $157,000 and pay Medicare. That's the double. This statute is not... As I understand it, they paid you, who were obligated to pay Medicare, the amount of the judgment. They paid us four months late. What? They paid you? You were obligated to pay Medicare? They didn't write out a check for this amount just for the fun of it? Well, no, they didn't. They did it after years of litigation and a judgment against them. Well, what was wrong with their litigating it? It was a tort case? It was a malpractice case? Of course, they were right. What do you mean, no? You made a statement after years of litigation as if there was some delay on that part. What was wrong with their litigating a tort suit? I was agreeing with Your Honor, Judge Wilkinson. I was saying, yes, they didn't write it for the fun of it. They wrote it after there was a judgment. A judgment that demonstrated their status as a primary payer under the statute. The cases around the country that have actually involved anything close to a failure involve more egregious circumstances than this, where somebody refuses to pay or where somebody just delays an extraordinarily long time. This doesn't seem to me to be the kind of bad actor that this statute is after because here there was a final judgment. I guess it was October 31st, and the payment came through in December. And as a homeowner, I mean, as a homeowner, I get bills all the time. And I get a certain period within which I need to pay them. And if they said, you've got to pay the next day, that would be outrageous. We're not saying it was the next day. We're saying it was 138 days of post-judgment interest that was paid, 138 days that they admit with their hard-earned money. It's not 138 days. It was 138 days. 138 days of post-judgment interest was paid to us because they paid 138 days late. All of the emails in the joint appendix from pages 47 to 55, if they signify anything, they signify that in August and September, we were trying to get the money from them. They paid it 37 days after the final judgment. That's not a failure to pay. They paid 37 days after a revision of the judgment. Under Maryland state law, and we cite the McQuitty case, McQuitty 2, the final judgment established that's relevant for this purpose, that's relevant to say they are a primary plan. It's not the October judgment. That didn't change anything about their liability. That's all right, but a judgment is a judgment. It's not part of a judgment. When we look at judgments, we look at judgments as a whole. This is a question of Maryland law. Yes. On a Maryland law, if a judgment is revised, the prior judgment just loses its finality, and it's the revised judgment that becomes the final judgment and the effective final judgment. And that's just a – you know, Maryland's not an outlier in this. This is kind of – this view of finality is one that's broadly adopted here. In the second McQuitty case in Maryland state law, cited in our briefing, the judgment was entered in 2006. It was subsequently vacated by the trial court, an appeal to the highest court of appeals in the state, remanded for revision under Rule 2-535, which it was revised, and the amount of the judgment was changed, and then we went back up to the court of appeals, and the court of appeals held that it was the original 2006 judgment that was the final judgment in the case, and that the argument that the judgment later on is the judgment, that was rejected by the court of appeals for purposes of setting when is the judgment and when is it final. So there was a final judgment in this case when the judgment and the judgment of liability was never changed, was entered on July 22nd. In August and September, we tried to get the money. They didn't pay. I'm not sure you could just parcel out a judgment into those kinds of segments. I think a litigant is entitled to litigate a case until a final judgment in its totality is reached. But what troubles me here is that Congress wrote a statute a certain way, and that is where there was a failure to pay, and this doesn't seem to me the kind of individual that they're after, and what you're trying to, you're trying to rewrite this statute into an unreasonable delay statute rather than a failure, and that's taking your words and putting them, taking Congress's words and replacing them with yours. And it wasn't, maybe Congress could have written an unreasonable delay statute, but it didn't write that kind of a statute, and it probably didn't write that kind of a statute because it didn't want interminable litigation over this kind of fact. And as I say, failures, I can't see paying someone 37 days or however many days after a final judgment is a failure to pay. I just don't see it. You can try to spin it, but it isn't a failure to pay. And what you're doing is you're waiting for a final judgment, and then once that happens, bing, there's another suit, and any time the payment is after that suit, you call that a failure. The payment to us is not the payment that matters, and the case for that was decided nine days ago in the District of Connecticut, I'll cite it to you, Aetna Life Insurance v. Guerrera, G-U-E-R-R-E-R-A, March 21, I'm sorry, March 13, 2018, by the District Court for the District of Connecticut. The District of Connecticut in the Second Circuit joins a number of cases that have held that failure to pay in 60 days after the judgment. Here, we sued 122 days after the judgment. Wait a minute, where do we get the 60? Because that's when Medicare can start collecting interest, right? Well, so the Eleventh Circuit has said that the way that they interpret failure is 60 days. No court has said differently. If we were to say there's no deadline, that would gut the statute. First of all, putting in a 60-day limit, that seems to me quite arguably a gloss on the statute. And even if you take the 60-day limit, the payment was made within 37 days, which is shorter than 60 days. So you can try to turn it into an unreasonable delay statute, which is problematic on its own terms. But even if it is an unreasonable delay statute, even if it was written that way, I don't see that we have an unreasonable delay here. And all this is on top of the problems of standing and whether you've actually suffered any kind of real loss. I mean, I think there's a standing problem here, and then you get to the merits, and there's a textual problem here, and then you get past the textual problem, and you have a question of the facts and the fact that they actually did pay, even under the way you want to rewrite the statute. My time is up, but if I may respond. You've got rebuttal time. I'll use that then. Thank you very much. Good morning, and may it please the Court. Christina Belay on behalf of Greater Baltimore Medical Center. As your honors know and have pointed out, there are two separate issues in the case, one being jurisdictional and the other being substantive. With respect to Ms. Nitro's claim of standing, Mr. Talley on behalf of Ms. Nitro raised this morning what he calls her injury in fact, and that is that somehow as a result of the delay, as he calls it, payment of the underlying tort judgment in this case, Ms. Nitro is out some sum of money. There are a few problems with that. Some have been discussed already, but the primary one is that that injury is not raised in the complaint in any way, shape, or form. Ms. Nitro's complaint alleges only an injury to Medicare. The exact language of her complaint says that as a consequence of the defendant's wrongful conduct, the federal Medicare program became the primary payer for the cost associated with items and services. It does not mention a delay in payment of an underlying tort judgment. It does not mention any injury to Ms. Bromwell or to her personal representative, Ms. Nitro. The case law in Maryland and throughout the Fourth Circuit is clear that a motion to dismiss must be considered on the actual complaint and the allegations made within it. If Mr. Talley raised today the very best argument ever in terms of standing and he suggested a new injury, in fact, that really raised your eyebrows and you thought that should be considered, it should not be or could not be considered if it was not raised in the initial complaint. And so that's what we're faced with initially. Even if Mr. Talley were to get over that hump and – Before we – Sure. Before you leave that room, can you give me an example of a situation where a plaintiff could suffer an injury under the statute? A plaintiff as in a Medicare beneficiary or some other – No, as a beneficiary. Sure. I think an example would be if the plaintiff had had their conditional payments paid by Medicare and yet Medicare was sending them letters and – Donning on unpaid bills. And sending collection notices and suggesting that we've paid this and we know that there's been a tort judgment but it's still outstanding and we're going to come after you for that. I think that could be a potential injury. And I'm not sure of the precise details of that but I can imagine a circumstance where that would apply. Okay, thank you. And there are certainly other private plaintiffs who can take advantage of this statute who are not Medicare beneficiaries. Mr. Talley suggested that the legislature intended for this statute to apply to Medicare beneficiaries. And he is correct in that there are multiple cases which suggest that or assume that. But what's important to recognize is that Congress cannot legislate away the requirements of constitutional Article III standing. They can't do that. That's clear and made particularly clear in Spokio. So what we have is a statute that could apply to multiple types of private plaintiffs. And Medicare beneficiaries may have a tough time showing that they have standing. But there are plenty of cases that show that other types of private plaintiffs can have standing including other insurance companies and health care providers. Both of which could suffer an injury as a result of Medicare's as a result of standing. At the bottom of it, under any private cause of action or under anything, there has to be an injury in fact. I mean, that's basic to what we do. I 100% agree. And I think that even if Ms. Nitro could establish an injury in fact, she then fails to meet the causation elements of standing, which are traceability and redressability. Southern Walk at Broadlands, which I cited extensively in Appellee's brief, really does a nice job of explaining those two elements. And it says that you can have an injury in fact, but if it's not traceable to the claim that you're making in federal court, then it doesn't matter. So here in this case, she's claiming that she wasn't paid her underlying tort judgment. And that's the claim that she makes in her brief and reply brief. That is not traceable to her federal court cause of action. GBMC could have paid Medicare directly, but not paid Ms. Nitro, the rest of the underlying tort judgment. Ms. Nitro's injury in fact would still exist, yet she would have no federal court claim. Her injury in fact that she's claiming is simply not traceable to the federal claim that she's making. Likewise, it is not redressable by what she asked this court to do, or the district court to do. She asks the court to, she says that she brings this action pursuant to the provisions of the MSP statute to recover the conditional payments and expenditures made by the federal Medicare program. That's the relief that she seeks. She wants to recover the conditional payments. Recovery of the conditional payment, which is owed to Medicare, and recovery for damages associated with that, does not solve her injury in fact, which she claims is something entirely different, the payment of the underlying tort judgment. That would not resolve that issue. Her injury is not redressable by what she asked the federal court to do. I'm happy to answer any other questions regarding standing, and otherwise I'll move on to the substantive aspect of the case. As Judge Wilkinson pointed out, this is simply not a case of failure to pay. One cannot both pay and fail to pay. Greater Baltimore Medical Center made the payment with respect to the underlying tort judgment to plaintiffs in the underlying state litigation. That amount undisputably included the amount owed to Medicare. This was not a settlement where there were particular terms on what was being paid and what was not being paid. This was a circuit court judgment following a medical malpractice trial, and the cost of medical bills were awarded. Following the trial, GBMC took appropriate steps to reduce that judgment pursuant to Maryland law. When a final judgment was issued, GBMC paid that amount and paid it within a reasonable amount of time. In Maryland, is there a normal time limit,  There's a time limit at which, actually, Your Honor, I can't answer that 100%. What I can tell you is that post-judgment interest starts to accrue on the day of the judgment. And here, Mr. Talley pointed out that Greater Baltimore Medical Center paid 138 days of post-judgment interest, and he used that to suggest to the court that the judgment really was 138 days late. So setting aside whether the 138 days is relevant, what I want to point out to the court is that is or was a business decision by GBMC to remove another aspect of potential litigation. So GBMC decided to pay 138 days of post-judgment interest, despite the fact that it had not been that long since the final judgment, in order to end that particular aspect of the litigation. These business decisions are made by litigants every day, all the time, and it simply does not equate with an admission of some sort that the judgment was paid 138 days late. Here, for purposes of this litigation, I think it's irrelevant whether the judgment was paid 50 days or 100 days or the revised judgment or the final judgment. Congress wanted to essentially punish a failure to pay, and that's not what happened here. There are multiple examples in the case law of actual failures to pay, and usually those involve parties who simply take the position that they are not required to pay, and so they don't. They don't pay after a suit is filed in the district court, and they don't pay while the case is pending in the court of appeals. They have taken the position that they are not required to pay, and so they do not. And when they are wrong, that's when the double damages kicks in, and the double damages say, no, you are a primary payer under the Medicare secondary payer statute, and as a result of your failure to pay, you are now going to have to pay double damages. What if you had a defendant who said, well, they may not have said, I'm not required to pay. They may not have sort of denied that they were required to pay, but they waited much longer than here. This is a pretty benign case, because it was the difference between the Maryland judgment and paying, which was 37 days. Suppose somebody never denied that they were paid, but just dragged their feet for two years. What do we do about it? In other words, I'm saying at some point, I don't want to, this case seems to me to hit the word failure right out of the statute. But at some point, when you have a two-year delay, does the length of the delay become tantamount to a failure to pay? I'm not talking about this case, because it was a fairly prompt payment. But if there's a two-year delay, even in the absence, even persons who have not denied the fact that they may have to pay, they just don't do it. But two years, at that point, does the length of the delay become tantamount to a failure to pay? Your Honor, I don't know the answer to that question. I don't know, and I don't think that Congress legislated this in a way that answers that question. I think that if I were standing here today, and I said to you, we're not denying that GBMC is obligated to pay, we just haven't gotten around to it. Whether that's a year later, I wouldn't feel comfortable doing that. So that, I think, could be considered a failure. It's the time that's passed and the context of that time. In all of the cases I've read where there's been a failure to pay, even as the appellate court is considering the case, there continues to be a failure to pay. And so I don't know that I can answer the question of whether two years or five years is tantamount to a failure. I think it depends on the context of what else is happening. I'd also like to point out that a private party is not, this is not the only mechanism of recovery. The exact same, essentially the exact same statute applies to Medicare. There's a second statute that allows Medicare to come after people or entities or insurance companies directly when they haven't paid. And certainly they didn't do that in this case. But the clock starts to run if there is a clock,  it's still your view that a clock starts to run from the point of final judgment. Because until the final judgment, once the final judgment, this isn't necessarily a question of federal law, it's probably a question of Maryland law. And although the Maryland law seems to dovetail with our own notions of finality, but once there's a final judgment, the interim judgment is just dissolved. I absolutely agree and I think that that just makes common sense. That's basic Maryland law. I think that is an accurate statement of Maryland law  This is not this case, but suppose GMBC was going to take an appeal from what was an admittedly final judgment. Can someone await the termination of the appeal to pay or is it doing the interim? Put it in an escrow? I think so, Your Honor. I think putting it in an escrow would perhaps be the safest thing to do. I would suggest that would be good legally. What most defendants would do that I represent. But I think there are lots of circumstances where an initial judgment issued on the day of a jury verdict is revised, whether it's revised up or down. And what I think Mr. Talley will agree with is that the ultimate amount of the final judgment impacts the amount owed to Medicare. Mr. Talley referenced procurement costs and we have a whole second appeal pending in the state of Maryland related to that particular issue. But the amount that is ultimately due to Medicare changes based upon the procurement costs that are calculated pursuant to Medicare statute. So this idea that GBMC was required to pay Medicare as a result of an initial judgment when it knew full well that it was going to be filing appropriate motions and that under Maryland law the judgment would be reduced, it doesn't make legal sense and it doesn't make common sense. Well, the other issue that I noted is that the original judgment was July 22nd and I believe you filed your motion to reduce on August 1st, which again would be a strong indication that there was no intent to delay. That's a very fast filing of a motion. And it took the court over two months then to consider it and obviously did give a consideration and you had the judgment reduced by about $80,000. But my understanding is that none of that $80,000 has to do with the actual monies advanced by Medicare, correct? Correct. So under Maryland law a plaintiff in a medical malpractice case is entitled to seek the amount of medical bills that they were billed. And that's what the jury awarded in this case, the amount that Ms. Nitro was billed for her medical care. What she is entitled to recover is typically less than that because she is entitled to recover what was actually paid by her or on her behalf. And so the reduction in judgment didn't impact the $157,000 and change due Medicare. It simply took away the excess that no one had ever paid. And that's the issue that's on appeal. That's the issue that's on appeal in the Maryland court. Again, having nothing to do with the Medicare advance. Right, right, exactly. Judge Brinkman makes a good point, does she not, when you say that the appellate here is trying to count the period against the appellee that the court itself took in resolving the post-trial motions or motions reconsideration, that's hard to charge the appellee here with the time that the court, as Judge Brinkman points out, the motion was filed fairly promptly. And the time that elapsed was the time that the court had the matter under advisement. That's certainly correct, at least for a portion of that time. And don't you also have on the record that you all were actually communicating, I think, in early August, so while that motion was still pending, about getting a taxpayer identification number? So an indication that you're getting prepared to pay, you just wanted that particular piece of information. That was actually one of the final points I was going to make. This was never a case where GBMC refused to pay or claimed they weren't required to pay. I don't recall the precise timing of that and whether it was before the final judgment, but what I can represent to the court is that the day of our hearing to reduce the judgment, which was granted, I emailed that very day with plaintiff's counsel and said, we'd like to get you paid. We need this piece of information and that piece of information to do so. Ms. Nitro claims that those were unreasonable or unnecessary pieces of information to seek, and I don't think that's relevant whether it is or not. I think the relevant part of this is that GBMC was attempting to pay, was planning to pay, and never took the position that it was not required to pay or was not planning to pay. So there was a genuine dispute between the parties in terms of what information from a financial standpoint GBMC was entitled to to cut the physical check, but this was just never a case where there was an intent not to pay. I'm happy to answer any further questions, but that completes my argument. Thank you. Let me make some points that respond to what counsel just said and also try to follow up on some of the points I think I may have made, but I might have gotten lost in the argument. You addressed basically, again, the point of standing here. Did you allege in the complaint the injury in fact? The case we relied on is a case from the District of Maryland, O'Connor v. Mayor and City Council of Baltimore, in which the District Court in Maryland held that a Medicare beneficiary who alleges that there's been a violation of the statute that has caused Medicare to pay for the medical costs and Medicare hasn't been reimbursed. That was a sufficient allegation to establish standing under this statute. We allege precisely the same thing because that's what the case law in our district says is enough. In addition to that, we allege the longstanding litigation and the unpaid tort judgment and that they hadn't paid Medicare. And there are injuries in that, in the violation of the statute, although it's not automatically underspoken on remand to the Ninth Circuit. The Ninth Circuit held that the violation of the statute in that case was enough to establish standing. The Supreme Court didn't say in Spokio that there was no standing. The Supreme Court in Spokio said the Ninth Circuit didn't look at particularized injury and concrete injury and they should do that. The Maryland case that you cite, what year is that? Is it before or after Spokio? Spokio is in 2006. No, it's from some time ago. So Spokio has come out since then. Spokio came out since then, absolutely, and we're responsible to deal with changes in the law. But the violation of this statute establishes an injury in fact. That's our contention. The injury in fact was that my client gets less money. You can measure my client's injury in dollars and cents. This is not an intangible injury. This is not a theoretical legal injury. This is an injury in dollars and cents. If we need to. But the money is not yours. The money is ours. No, the money is ours. The money belongs to the estate. It is hers. My clients will get nothing in this case. This jury decided. You're obligated to turn that over to Medicare. We're obligated to turn over a portion of it to Medicare and we're allowed under the law to keep a portion of it. Number one. Number two, they're obligated to pay $157,000 to Medicare even though they paid us. Western Heritage says that and all the cases that follow Western Heritage say that. The goal here is to hold the primary plans liable. That's what Congress intended. That's what we're trying to do. The delay. GBMC's counsel stood here and said, well, if it was two years and I had to stand here, I'd be uncomfortable. It's just not saying that would be a failure. In every case, if all it took was to pay the liability after the lawsuit's been filed, then there is no point to a private preservation. Well, no, that's not driving it. No, there's no point. First of all, the two-year case is not before us. No, the 60-day case is before you. 60 days is, by the way, what they claim. 60 days isn't in the statute to begin with, but 60 days from what? 60 days from the date that the judgment establishes their responsibility as a primary plan. That's when. When they have notice of the amount and they have notice that they are a primary plan. Medicare. Mr. Tolley, listen. When he starts talking, you need to stop. I apologize, Your Honor. You keep wanting to avoid the term final judgment. No, no. And it's almost like you're dancing around. You just won't use the term final judgment. Because we attach quite a bit of importance to final judgments. And we dismiss interlocutory appeals all the time. And it's because the reason is that when there's a lawsuit the way this one was in Maryland, that sometimes the different parts of a judgment impact other parts of the judgment. And you want to see that kind of thing wrapped up as a whole. And they had a perfect right to defend their case. And they also had a perfect right to ask for reconsideration. Which, in fact, reduced the total award. And it just does when you talk about the purpose of a statute. I can't believe the purpose of the statute is to get somebody who the questions, comments of opposing counsel have indicated this person based on the record is not a bad actor. It wanted information, yes. But it wasn't digging in and declining to pay. It just doesn't seem to me the kind of malfeasance that they were after. And what it would lead to is a bunch of people filing a lawsuit right after a final judgment came down and then saying no matter how quickly it was paid, it was paid only after the lawsuit. Therefore, there was an undue delay or an unreasonable delay. And it's all kind of abuse that would lead, that this would lead to if somebody with this record, when any delay was due to a motion for reconsideration, the fact that they wanted information, the fact that there was no final judgment, the fact that the thing was held under advisement by the court. Those are not indicia in this record of a failure to pay. They just aren't. And they're not just one indicia there. They're four or five. So the case on, I'll say final judgment. And I apologize for speaking over your honor. That's okay. That's not my, terribly. That's right, I always. And now my time is up. The Maryland case, I want to leave you. I've been awful about it. So go ahead, I'll give you the last word. Thank you, your honor. The Maryland case I want to leave you with is the third in a string of court of appeals decisions, Spangler and McQuitty. 449 Maryland 33, footnote 12, where the court clearly states final judgment is not affected by the subsequent things that happened in that case, which included vacating the award and appeals and remands and another appeal and another remand. The 60 days, I also refer you to the joint appendix, page 44. That's what they said the deadline was in the district court, 60 days. And we waited 122 days from what we believe is the final judgment establishing their liability. $389,000 was never in dispute after the entry of that judgment, including every penny of the Medicare liability, every penny of it. None of the Medicare liability was at issue in the ministerial reduction, which we ended up, we all agreed to the number. That's what I leave you with. Thank you very much. Thank you. We'll come down and greet counsel and move directly into our next case.
judges: J. Harvie Wilkinson III, William B. Traxler Jr., Leonie M. Brinkema